Court of Appeals we have three cases to be submitted today on oral argument and we begin with Crown Castle Fiber v. City of Pasadena. Mr. Helfand, how many Fifth Circuit arguments for you Mr. Helfand? Have you kept score? Total? Yeah. No, this is my third this week. Third this week, okay. Thank you for having me. It's been a pleasure. And I've hit each courtroom this week. I'm going to ask Mr. Post the same question. Well, I'm sure his exceed mine in total and I've had the good fortune this week of not having to trouble the same panel more than once. May it please the Court, Bill Helfand for the City of Pasadena. In this particular case, although the appellee points to cases in which the Crown Castle company provided telecommunications services, it's undisputedly a case in which Crown Castle was not providing any telecommunications services at all as defined by the Federal Telecommunications Act. In fact, although it took a while in his deposition, the company's corporate representative who was the Vice President for Governmental Affairs, Amanda Dare, admitted at Record 1916 and in his deposition at 2932 and 33, the sole purpose of Crown Castle's work in this case was to erect poles and antennas for the customer that contracted for those services, which was T-Mobile. At 653 to 654 in the record, and again at 1932 and 33, Mr. Dare on behalf of Crown Castle admitted that the work in question here was solely for that purpose and solely for a telecommunications company identified as T-Mobile. Now, T-Mobile's corporate representative, a gentleman named Hayden, at 1893 through 95 in the record, testified that T-Mobile, not Crown Castle, was the telecommunications company here attempting to deploy additional small cell nodes to augment their 5G network. This is not a case, and to be sure, Crown Castle does from time to time provide telecommunications services, and the appellee points to cases in which Crown Castle has utilized fiber optic cables for that purpose as well as their own distributed network systems in order to provide telecommunications services. But those are a red herring because in this case, Crown Castle has admitted the only thing it contracted to do was deploy antennae, and to deploy those antennae according to their plan on poles that Crown Castle wished to erect. Now, notably, T-Mobile has not intervened in this case and has not claimed any prohibition or impairment of their ability to carry out their telecommunications functions for which they contracted with Crown Castle. Now, in addition to erecting these poles and placing the antennas, importantly, here the evidence shows that Crown Castle rents pole space, and ultimately it appears that the reason Crown Castle focused so intently on erecting poles in the city's right-of-way was because as Crown Castle and Sprint, I'm sorry, T-Mobile agreed, particularly in 1900 and 1902 of the record, Crown Castle was permitted by its contract with T-Mobile, after erecting those poles, to rent space on those poles. And that appears to be one of the two reasons, and I'll get to the second in a moment, that Crown Castle focused solely and only on deploying these small nodes on new pole locations in the right-of-way. That's despite the fact that T-Mobile data provided to Crown Castle showed an acceptable circle, sometimes as wide as 150 feet in diameter, for acceptable deployment of these nodes, yet Crown Castle repeatedly admits it made absolutely no effort to locate anywhere for these nodes other than on newly erected poles in the city's right-of-way, despite the fact that Crown Castle's government affairs vice president, Mr. Durer, specifically instructed Crown Castle to initially come up with a plan that would have allowed for deployment consistent with the city's requirements. The last thing you said is an interesting fact, but how does that relate to the issues at hand? It's perfectly fine that you told us that, but why does that matter? Well, because Crown Castle has admitted that, let me jump to that, Judge. The argument that Crown Castle posited in the trial court and asserts here is prohibition under 253A of the Federal Telecommunications Act, and of course prohibition has a wider term, and including through the FCC's small node ruling, it doesn't mean an absolute bar, and the FCC took issue with some other appellate courts which had held that that requires an insurmountable burden. The FCC's small node ruling suggests that there needs to be something between an absolute bar and just complete freedom to do so. In deposition, the reason that's important, Judge, is because in deposition, Mr. Durer, on behalf of Crown Castle, I repeatedly asked him, do the city's regulations prohibit, as defined under the Federal Telecommunications Act as well as under the FCC's small node interpretation, do they prohibit the deployment of the network system? And Mr. Durer's response, and this is at 1928 through 1931 on the record, and also at 3089 and 3143, is they don't prohibit T-Mobile's upgrade efforts. They only prohibit it as Crown Castle initially designed it, and that's the problem. What Crown Castle did was they came up with a design that would allow them to put 100 new poles, or at least require them to ask to put 100 new poles. Your point is they could have done it a different way and we wouldn't be here, is that it? Absolutely, Judge. Thank you very much. Yes, that's absolutely right. And, in fact, after Mr. Durer, on behalf of Crown Castle, learned that the city had rejected the first 22 applications, he wrote, this is at record 3145, to his own employees, quote, you won't get them to agree to change their regulation and issue a variance. It's the law and there won't be variance issued by them. I thought we had chosen locations that would be approved per their design manual. I don't understand how these locations were chosen. Why are we picking residential sites? This is extremely frustrating. This is an internal email. Am I correct that the two arguments you've made so far, number one is Crown Castle isn't transmitting. It's not a telecommunications service provider. That is absolutely number one, yes, Judge. And then the second point you're arguing now is that the design manual, even undergrounding provision? Even undergrounding. Does not have the effect of prohibiting? Yes. Those are your two arguments. Yes. And, in fact, Crown Castle. But doesn't the FCC order itself specify undergrounding as something that would prohibit? No. It doesn't go so far as to say undergrounding would prohibit. In fact, Crown Castle admits they do underground in location. They find it to be too expensive. They maybe can. Right. Okay. And the FCC small note order does not go so far as to say undergrounding constitutes a prohibition. And I appreciate where you're going. So you're not surrendering the jurisdictional threshold arguments? Oh, not at all. Well, would you agree that the Southwestern Bell case itself forecloses arguing that there is no jurisdiction to adjudicate the preemption aspect of 253? I would respectfully disagree. In 2008, that very well may have been the case, but as of the Supreme Court's opinion in Armstrong v. Exceptional Child Center in 2015, the Supreme Court tacitly overruled the basis for this court's finding jurisdiction for injunctive relief in the Southwestern Bell case. Okay. So your argument is Armstrong has implicitly overruled our Southwestern Bell decision? Yes. It certainly didn't take up the Southwestern Bell decision, but the grounds for, as the Court will recall, in the Southwestern Bell decision, the grounds for the alternative relief of injunctive relief notwithstanding the unavailability of a private right of action was the supremacy clause. And in Armstrong v. Exceptional Child, the Court specifically said, the Supreme Court said, Respondents cannot, by invoking equitable powers, circumvent Congress's exclusion of private enforcement. So if we take this Court's decision in Southwestern Bell, certainly I think everyone can agree, in Southwestern Bell, the Court held that there is no right of private enforcement under the FTA to enforce 253A. The Court then went to the question of an equitable relief under the supremacy clause, which is exactly what the plaintiffs did in Armstrong v. Exceptional Child Center. The Supreme Court held that that is foreclosed. While Crown Castle cites that case, they ignore the holding. And the holding in Exceptional Child Center is very clear that there is no jurisdiction to do what Crown Castle asked and the district court did, which was to grant injunctive relief under the supremacy clause. Your related threshold argument is the ripeness one? Yes. Or is ripeness going more to whether or not the design manual prohibits, implicates? The ripeness argument is saying what? That they had to wait until they got a permit? No, the ripeness argument is consistent. Let me find that case, and I appreciate you're moving me along, Judge. That's really helpful to me. The ripeness argument is that under the urban development v. City of Jackson case, this Court has always required that when it comes to contesting municipal action, the action has to rise to the level of the municipal decision-makers. That is, there has to be a request for a variance made. Okay. It has to be a request for a variance. And the city itself, the city body that has the authority to grant the variance, has to refuse it. What the record shows here, and it appears to be this, I think it goes back to Judge Smith's threshold question, appears to be that Crown Castle wants to use this case, because these same design manual restrictions exist in Galveston, and throughout the Dallas metroplex area, to use this case to get a ruling from a court that they can now just go into Wright Subway and start erecting poles. Why? Because those poles have value to them beyond the service of providing it to someone like a T-Mobile, and so here, rather than appealing to the city, Crown Castle has created the problem, and it's twofold. One, they applied for 22 permits, 16 of them were refused on failing to comply with the design manual, yet Crown Castle chose not to erect any of the poles that were permitted. As to the 16, Crown Castle affirmatively chose not to make any effort to seek a variance from the city. And then as to the other, I think it's a total of 66 once they remove the residential ones, as to the remaining ones that were not in residential areas, they didn't even apply for a permit. So they don't even know how many of those may have been permitted, nor does the court. And then beyond that, when the city, the lawsuit was already pending, and Crown Castle was not contesting the undergrounding in residential areas, and it's worth keeping in mind that Crown Castle accepted the design manual limitation of no, no deployment in residential areas, zero. The city then retrenched from that, and offered the opportunity not just to Crown Castle, but to anyone who wanted to deploy, the ability to deploy in residential areas if they complied with the undergrounding requirement, and in that respect, the city actually broadened the opportunity. Crown Castle made no attempt to even obtain a permit, let alone see what the result of that permit application would be, or to seek a variance, for example, to perhaps not underground, in a manner that the city could have worked with them to accomplish the goals of undergrounding, that is the lack of the blight that's caused by putting poles in residential areas. But again, those are all open questions. The last thing I'd like to mention during the short time that I have remaining is the safe harbor bar under 253C of the Act. The trial court treated this as an affirmative defense. It's not an affirmative defense. It wasn't an affirmative defense when this court took it up in the City of Houston versus, the Southwestern Bell versus City of Houston case. Rather, it's a limitation on the reach of the statute. 253A provides preemption to some degree, and 253C limits the amount of preemption. And that's exactly how this court treated it in the Southwestern Bell versus City of Houston case. But even if it were an affirmative defense, it was raised by the city in a 12B6 motion to dismiss, which according to this court in Garrett versus Commonwealth Mortgage, which is at page 41 of the brief, is adequate to raise an affirmative defense. Inadequate, you said, too, right? Adequate. Is adequate. Adequate. It was the first response of pleading, and that's what Garrett calls for. And to be sure, Crown Castle joined issue on that in response to the motion to dismiss at Record 85. So there's no question that 253C was in the case, but the trial court treated it as an affirmative defense that was waived for lack of filing an answer, even though it was in the case before the time for an answer. The last thing I would mention is I really thought we were going to have a trial in this case. I was actually a bit shocked because there's a fact question here as to both whether Crown Castle is a telecommunications company in this instance covered by the Act. It admits that it's not. T-Mobile says that it's not.  Well, that would be – it seems to me that would be a legal question because the raw facts are undisputed, aren't they, as to that legal question? The question of the statutory interpretation is a legal one, but there's a factual dispute here, obviously, when the company says that they're a telecommunications company but the evidence demonstrates to the contrary. I mean, to me that sounds like a question of law because, I mean, are there any what I'll call raw historical facts that are disputed about which entity does what under this whole scheme? No. There's no dispute. Everybody agrees that in this case Crown Castle was not providing telecommunications. I mean, I know because of all your experience in 1983 cases you know what a factual dispute is. It just doesn't seem to me that this is – that this would be a factual dispute. I understand. Yeah, sure. Judge. On that little dialogue, just legally, not factually, is your position that you are not a provider of telecommunications services when you facilitate, only facilitate the transmission? And if so, what's your best authority for that? Is that your position, first of all? And if so, do you have authority? So they build a pole. The pole is essential to the transmission. They're still not a telecommunications service. Is that what you're saying? Yes. Yes. In this case, erecting a pole is not telecommunications services, especially a pole that by its very definition – because I'm asking you to go over – and it was your first argument. I took you off it. What's the best authority? Well, I think the best authority for that, Judge, is the statute. Okay. That's fine. It's 153.3 of the Federal Telecommunications Act. I'll mention my second point when I have an opportunity. Yes. You saved time for rebuttal, Mr. Helfand. Thank you. Okay, Mr. Post. You know which question to answer first, right? May it please the Court. I know enough to answer the Court's questions. I actually had a client ask me that question a few months ago, and so I'm prepared to answer it. This is approximately number 50 for me, give or take a few, as evidenced by the receding hairline. I'd like to address the arguments that counsels presented in the order that I think they logically arise for the Court's decision. And so I'll begin with the question, Judge Higginson, that you asked about the existence of jurisdiction and the right to seek this injunctive relief. We do think, as counsel acknowledges, that Southwestern Bell established as a matter of circuit precedent that obviously this court has jurisdiction, the district court had jurisdiction to entertain a request for injunctive relief, and that that relief is appropriate as a matter of equity. Counsel suggests that Armstrong somehow forecloses that circuit precedent from being applied here. I don't think that's correct. Armstrong on its face does nothing to change that circuit precedent. And this court in its en banc decision in Green Valley just a couple of years ago I think reiterated that same proposition, that as a matter of long-settled law, a party that asserts that an assertion of state or local law is a violation of federal law is entitled to seek an injunctive remedy to prevent that invasion of federal rights. And so I think that is settled as a matter of circuit precedent. I'll briefly point out that the rationale that counsel alludes to based on Armstrong really wouldn't apply here in any event, even if you were to entertain it as a matter of first principles, because Armstrong focused on the idea that the Medicaid statute in that context provided a sole remedy, which was the withdrawal of federal funding, and it would be judicially unadministrable to allow private actions seeking injunctive relief. Neither of those is the case here. For 30 years the federal courts have recognized that there is not a sole remedy under this statute that forecloses courts from granting preemptive relief. The FCC itself has acknowledged that it doesn't have exclusive authority. We point out in the brief that in Section 255F of this statute, Congress did provide exclusive authority to the FCC in certain respects. It didn't do so with respect to Section 253. So it's not a case where you have a sole remedy premise. But equally important, this is nothing like Armstrong, where you had an impossible task for courts to administer what was nothing more than a general funding standard to maintain adequate, efficient Medicaid funding to serve state residents. This is a much more particularized provision. The statute provides that any state or local regulation that effectively prohibits the development of wireless technologies is preempted, and for 30 years courts have been able to administer that. So I don't think the Armstrong rationale would apply here in any event. There was a brief discussion of ripeness. While I'm talking about jurisdiction, I'll touch on ripeness as well. I think that the court's decisions in Rosedale and in Monk, which hold that these kinds of prudential considerations that apply to the ripeness of a regulatory-taking claim just aren't applicable here, because the rationale of ripeness in a regulatory-taking context is bound up in what was the intent of the government, what were the reasonable investment-backed expectations of the property owner, what's the degree of the invasion of the protected property interest. None of that is at issue in a preemption case. And so that rationale is simply inapplicable, and I think it's foreclosed by circuit precedent. As council acknowledges, many permit applications were made and were rejected for violation of the 300-foot spacing rule. We have a slight disagreement about the numbers. We count 18. They count 16. But there's no question that they have consistently enforced that 300-foot spacing obligation, and their witnesses testified that there would not be variances granted from it. And it's conceded that the undergrounding requirement applies to 33 of the locations in the projected deployment, and therefore on its face that conflict is apparent. It looks like you have a question, Your Honor. I always probably look like I have questions. The record does extensively go into factual disputes relating to, well, is the avoidance of densification your client's effort to be able to put its own poles up? So you just get a forest of poles because it wants to charge rent for other people rather than pay rent to go on the AT&T pole. And I don't know if that goes to preemption. No, clearly it doesn't. But ripeness or maybe, oh, no, there are other poles there, therefore requiring you to be on them, keeping the aesthetic beauty of the neighborhood isn't prohibiting you. I think, Your Honor, that's their argument on the merits of the summary judgment. It is not. I don't think it's a ripeness issue. I think it's a merits issue. I guess you're right. So then going to do you want to jump to that then? I'm happy to turn to that. Actually, before you leave ripeness, he did mention City of Jackson. I don't have firsthand recall of it. Do you? Your Honor, I don't think that it's incompatible with what this Court has said in Monk and Rosedale, that these types of considerations just aren't applicable here. So I'll turn to the merits issue, and then I want to turn back to the question of whether we are a telecommunications service provider. But in terms of the merits question, you have heard their rhetorical theory about what they think the motivation for Crown Castle is. That's not legally material. We don't concede that that's correct, but it's not really the question before the Court. The question before the Court is whether these local regulations effectively prohibit the deployment of the wireless technology. And as interpreted by the FCC in the small cell order test, the question is whether those provisions materially inhibit the deployment of small cell technology. And the small cell order speaks to that directly, and I would point out that in paragraph 3. When you say speaks to that, you mean both densification and undergrounding? It does, Your Honor. It applies the longstanding material inhibition test, which originated in the California payphone decision shortly after the statute was enacted, was approved by the courts for a generation, and it applies that material inhibition test to the particular context of deployment of small cell technology. Wouldn't anything that costs more be materially an inhibition? Well, Your Honor, I think that gets into the question of what is material. I mean, obviously there may be incremental increases in costs that a court would determine are immaterial. That's not the case here. What we have here is a record in which the evidence conclusively establishes that it is not technically feasible for Crown Castle to deploy this small cell network in the manner in which it must be deployed in order to maximize coverage and capacity for the Pasadena region. There is no dispute of fact of that. And when counsel quotes his questioning of Mr. Durer, the Crown Council representative, he is taking out of context some specific exchanges which Mr. Durer specifically explained Crown Castle is precluded from deploying its small cell network by the 300-foot spacing regulation and the undergrounding regulation. And it is because given the existence of the current utility poles in the city of Pasadena, it is not technically possible to deploy the network in Pasadena in a way that will accomplish the intentions of small cell technology. It's important to remember Pasadena stands alone in the entire greater Houston metropolitan area in this respect. The plan covered the entire metropolitan area. Crown Castle has been able to deploy this technology in every other area of Houston consistent with every other city's local regulations. Pasadena is the only jurisdiction that has precluded it. And it's simply a function of the way in which the Pasadena regulations are written and the location of the existing utility poles in Pasadena. And there is no dispute in the evidence on that, and I'll point the court to some specific passages of the record. If you look at pages 1921 to 35, this is the testimony of Mr. Durer, the Crown Castle representative, where he repeatedly explains the way in which the Pasadena regulations prohibit Crown Castle from deploying the technology. And again, if you look at pages 1411 to 1558 and 2308 to 2413 of the record, those are the expert reports and depositions of Crown Castle's experts that explain in intense detail this technical infeasibility. And I will tell you, as a former historian, it's a tough read for anyone who doesn't specialize in this technical detail. But it goes through in chapter and verse and explains why it is not technically feasible to install the small cell technology in Pasadena in compliance with these regulations. That's just not controverted by any evidence from the city. What also is not controverted by any evidence from the city, while I'm touching on the merits question, is the fact that the city is overtly discriminating against small cell technology. This is not competitively neutral regulation. It is directed at small cell technology. And as we explain in the brief... Is there any clue as to why that's happening, why the city would do that? I'm sort of asking you to speculate, but I'm just curious why that would happen. Your Honor, I won't speculate on what motivations the city may have had. I will say that the record bears out that the city may not know what its motivations were. The city got this recommended manual from a third-party attorney, not the city's attorney. It was presented to the city council for approval without any independent evaluation of the reasoning for these regulations. And when we examined the city's witnesses to ask what was the basis for this regulation, they don't know. And so with respect to the discriminatory nature of these regulations, I want to walk the Court briefly through a piece of the analysis that we didn't explain in detail in the briefing. We refer repeatedly to the design manual. And I'll call the Court's... Is this a C-Farber point? No, actually, Your Honor, I'm going to make a point about the manner in which the regulations are discriminatory, and the FCC recognizes that when regulations discriminate against particular wireless technology, that is itself conclusive proof that they are not reasonable regulations and therefore they materially inhibit the development of the technology. Am I oversimplifying? Is that the flip side of Subsection C? I think it is, Your Honor. And in fairness, I think that the FCC has read 253A in a way to be congruent with 253C, so it doesn't issue an interpretation about the scope of 253A that would conflict with 253A. But if you're persuasive on that, then there is no waiver of Subsection C by the city. Well, no, I don't think that's correct, Your Honor, because it remains the case that 253C is a safe harbor. It's a statutory safe harbor, which they did not plead. Judge Hittner denied leave to amend to assert that defense. That just has legal consequences, and they have not shown an abuse of discretion in that respect. And I would call the Court's attention to your decision in Odin, in which the Court held that statutory exemptions are affirmative defenses that must be pleaded. And on its face, this is a defense. It's an exemption. It says except as otherwise provided in the statute or nothing in this provision forbids. And so it's structured as a statutory safe harbor. That's the way it's consistently been applied. Therefore, it's just not in the case. But it's intrinsic to Subsection A. It is. I wouldn't say it's intrinsic to Subsection A, but obviously the Subsection A rule of material inhibition is subject to a defense. And I think the FCC has tried to interpret the rule in a manner that would not create a needless conflict with reasonable local regulation. The point here is that whether you're looking at it through the lens of the safe harbor or the general rule, the regulation overtly discriminates against small cell technology. And because we didn't give you this language directly in the brief, I want to guide the Court through this. At page 1644, you'll see the design manual itself, and it specifically says it's for installation of network nodes and node support poles pursuant to Texas local government code Chapter 284. Chapter 284 is the Texas statute that is intended to implement the small cell deployment technology. Here's what I want the Court to understand. All of the rules that we're talking about here regulate node support poles and network nodes. When you look at the definitions in these regulations, you will see that that is a limit to small cell technology. And I'm going to be pointing to definitions that appear at page 1648 and 1649 of the record. And here's the way it works. A node support pole, which is what is restricted by these regulations, is a pole installed by a network provider for the primary purpose of supporting a, quote, network node. A network node, in turn, is equipment at a fixed location that enables wireless communications between user equipment and a communications network. The term does not include, quote, a macro tower. And a macro tower is defined as a tower greater than the height parameters prescribed by Chapter 284 that is capable of supporting antennas. And so the point is that this regulation excludes macro towers, the preexisting technology, from the 300-foot spacing rule and the underground requirement. It applies only to small cell technology. It is facially discriminatory and, therefore, facially, materially inhibits this technology. So it's facially discriminatory unless it applies equally to all telecommunications service providers as opposed to it's facially discriminatory when it treats the same kind of telecommunications providers. Your Honor, I think that as I read the statute and as the FCC interprets it, discrimination against the entire class of small cell technology providers. The same kind of. Yes, I think that is the sort of discrimination that the statute doesn't permit. The statute doesn't allow local government to say, we prefer antiquated technology with lower capacity that requires less densification and we will discriminate against small cell technology that will maximize densification and increase capacity. The whole point of this statute. 4G and 5G are the same kind. It's just time has moved on. Yes, that's right. And I think that's important because as the Ninth Circuit construed the statute in the direct review from the small cell order, the Ninth Circuit said that localities can draw reasonable distinctions among functionally equivalent but physically different services. So 4G technology, pre-existing macro technology, is functionally equivalent in the sense that it is still providing the same basic wireless technology but they are physically different facilities. You can only draw reasonable distinctions between those two. You can't discriminate against the entire category of small cell technology, which is what the city is doing. Can I take you back to the statutory definition of telecommunications provider? Yes. Lay out for me just the textual basis for why your client falls squarely under the definition. Absolutely, Your Honor. I'm going to quote from the definition of a telecommunications service provider, the definition of telecommunications service. As we explained in the brief, there's two pieces to the definition. The city has never been willing to grapple with the second piece. So let me lay it out. A telecommunications service means the offering of telecommunications for a fee directly to the public or to such classes of users as to be effectively available directly to the public, regardless of the facilities used. We provide our services to providers, carriers, who offer their services directly to the public. You do more than just erect the infrastructure? We do. We do, Your Honor. And so I was going to turn to the definition of telecommunications because that's important to understand what, in fact, we do. Telecommunications is defined as the transmission between or among points specified by the user of information of the user's choosing, without change in the form or content of the information sent or received. Here's what's going on in this small cell technology installation. Yes, the small cell nodes and the antenna themselves are the property of the carrier. We install those nodes on behalf of the carrier. But they are tied to our fiber optic cable. And so when a user activates a data session or a call and sends a wireless signal to that node, that signal is then transmitted through Crown Castle's own fiber optic cable to the hub from which the signal is then ultimately distributed to its end. Crown Castle is transmitting? Yes. They are Crown Castle's fiber optic cables. Crown Castle is transmitting that information in precisely the form that it was received without any changes. What if you put the cable up but you don't own the cable? If you're just the contractor? Well, yeah, you're an electrician. You're the pole guy. Right. You are facilitating the services. And I'm happy that the court asked that question because that is not our position. Our suggestion is not that simply because you facilitate the delivery of telecommunication services, you come within the scope of the statute. We are, in fact— You're a service provider because they still own the fiber optic cable through which these— That's right, Your Honor. We are, in fact, a telecommunication service provider by virtue of our own cable, and we are then in contract with a carrier that owns the small cell node and the antenna. We receive the information into our system and transmit it without any change through our system. We are a telecommunication service provider, and I will make the point because we thought about this precise question last night. No court anywhere in the United States, circuit court, district court, has ever held that Crown Castle is not a provider of telecommunication services. It would be an unprecedented holding to reach that conclusion. The FCC recognizes that we're a provider. The Texas PUC has recognized that we're a provider. We fall squarely within the language of the statute. If the court has other questions— Yes, Your Honor. Do you rent that cable to T-Mobile? Is that the way I should think of it or not? Well, Your Honor, we have a contractual provision with T-Mobile by which we allow T-Mobile the use of portions of that cable. I don't know whether it's technically characterized as renting or a licensing fee. I wouldn't want to overstate my client's understanding of that relationship, but certainly that's the commercial relationship between the parties. If the court has no other questions, I appreciate your time. Thank you, Mr. Post. Mr. Helfand, you've saved some time for rebuttal. Thank you, Your Honor. Let me start by addressing Judge Wood's question. Counsel is correct to say that from time to time, Crown Castle uses fiber. There was no permit application for fiber here, and again, he's appellate counsel. Trial counsel would know. The testimony from Crown Castle's own vice president for governmental affairs was our role here was to build towers and put antennas on them, and the argument as to why the poles had to be where Crown Castle said they had to be was not because of a fiber optic network that has been discussed here, but rather because the poles had to be in a location where they could communicate by radio for T-Mobile with each other for T-Mobile. The argument that because we make our services of erecting poles and putting antennae on those poles makes us a telecommunications provider would make everyone who builds a T-Mobile store a telecommunications provider. They're just building infrastructure. In what respect, then, do they not qualify under what was referred to as the second part of it, statutory definition? Because the make available to the public is making the telecommunications service itself available to the public. But that part of the statute doesn't require that they directly make available to the public. In fact, it specifically says to the contrary that they don't have to. I don't think it says to the contrary. No, those were my words. I appreciate it. It's still bound to the question of the provision of telecommunications services. Again, to take counsel's argument just as it is on its face, someone who builds a T-Mobile store, then, would be a telecommunications provider. But he explicitly disclaimed that. He specifically said that isn't their argument, the pole, store, and electrician guy. No, because it's... He's saying here actually T-Mobile is paying them some money. There's some contractual arrangement to transmit across fiber optic. They continue to own. You say that's flat. Well, I don't think you'll find that anywhere in the record, Judge. I think that that's what happens in some cases. But here the permit application was to erect a pole on which they were going to put an antenna. And, in fact, Mr. Durer, and I provided it earlier, and I'm not sure if I have time to find the reference, Mr. Durer, on behalf of Crown Castle, testified, we can put these nodes, these nodes, in other locations, but we made no effort to locate them. That's at record 1927, to locate another place for them. This fiber optic argument is a red herring. You'll find nothing in the record indicating that the problem with the placement of the poles had something to do with fiber optics. Moreover, there's one thing I didn't get to mention before I closed in the opening was the question of prohibition here is obviously a fact question. The district court simply made the conclusory statement that the statute, that the regulation prohibits telecommunication services without explaining what those telecommunication services were. Certainly the trial judge seemed to think they were actually the provision of cellular service, which now we know they're not, but also did not talk about material inhibition or prohibition. He simply made the conclusory statement. I do want to be clear on the Green Valley reference. Well, before you jump to that, what's your best record site that there is a fact dispute as to whether the design manual materially inhibits? Well, at 1927, for sure, in that Mr. Durer admitted that the antennae can be deployed elsewhere, but that he chose not to. Let me give you the site from the T-Mobile representative as well. Mr. Hayden testified that it placed no restrictions on where Crown Castle placed the cells. And I'm sorry, I want to- That's all right. You only have a minute. Go ahead. Well, and let me give you one or two others here, Judge. Record 1360 at note 12, Crown Castle's response to the motion for summary judgment, they conceded they could deploy these nodes on existing AT&T telephone poles, but that they chose not to look into doing that. They also had- That doesn't mean that it doesn't materially inhibit. It could, you know, you could- Oh, I thought you were asking a question about a fact question about prohibition. Well, and I'm assuming, but you could dispute it legally, that effective prohibition equals material inhibition. Yes, sir. And, you know, there are other poles, but if they're not at the right 30 to 34-foot thing, that's a problem. Well, let me speak to the 34-foot thing, and this is, again, the other problem. Crown Castle, the record shows that Crown Castle ordered the antenna before they sought permits. The antenna can be at any height, is the testimony. These needed to be at 34 feet because they had already ordered these antenna before they had actually gone ahead and sought permits. So they could have put them on CPE poles or on center point poles or AT&T poles. I see my time has expired. Thank you very much. Thank you, Mr. Huff. And your case is under submission. Next case.